---

C. W. COCHRANE, The (HAYDEN v.). See Case No. 6,258.

---

## Case No. 3,525.

### The C. W. RING.

[2 Hughes (1877) 99; 2 Am. Law Rev. 259.][1]

#### District Court, D. South Carolina.

##### SALVAGE—DISTRIBUTION.

A brig loaded with 600 bales of cotton, which had lost her anchors and masts in a storm at sea, and was sailing in distress near a lee shore with a jury-mast under a foretop-staysail, hailed a large steamer for a tow, and was taken into port in seven hours, the storm having abated and weather growing calmer during the tow. The steamer was worth $140,000, her cargo was worth $250,000, and her engines $25,000. On a libel for salvage, *held*, that out of the salvage-money decreed, the owners of the steamer should receive three-fifths, and the master, officers, and crew two-fifths.

[Cited in The Pomona, 37 Fed. 816.]

In admiralty. Distribution between owners and crew of the salving steamer, the Alhambra.

Before the Honorable George S. Bryan, district judge for the district of South Carolina, sitting as referee before the organization of the district court.

BRYAN, District Judge. The question to be determined in this case is the distribution of the sum allowed for salvage between the owner of the salving ship, the Alhambra, and the salvors proper, the captain and officers and crew of the Alhambra. The decision of this question is referred to the undersigned by an order of Brevet Major General Devens (the basis of these proceedings), of March 2d, 1866, which orders that the sum of twenty thousand dollars, first proceeds of sale of certain portions of the cargo of the brig C. W. Ring, be deposited in the First National Bank of this city, or with such other depository as the parties interested may select, as the salvage of the said brig C. W. Ring and cargo, subject to the orders of the general commanding the district, or his superior, and "to be paid into the registry of the district court of South Carolina, as a court of admiralty, when such court shall be organized, to be by it distributed to the claimants, or, if the parties interested shall agree upon an arbitrator to settle conflicting claims before such court is established, such fund then, upon the order of the major general commanding as aforesaid, to be paid over to said arbitrator, or upon his award." As such referee, authorized by this order, and agreed upon by said parties in a paper, also of the proceedings in this case of date 21st

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

of March, A. D. 1866, signed by John C. Shaw for Oliver P. Hazard and others of the crew, and by William Alston Pringle for the owners of the Alhambra, I proceed to the consideration of the question involved.

The facts which give character to this case are few and undisputed. The salved brig, C. W. Ring, from Galveston, Texas, with six hundred and twenty bales of cotton, James McLean master, in the month of October last was overtaken by violent gales, in which to save her, her masts had to be cut down, and coming to anchor she lost both of her anchors, and was thus reduced to a very helpless condition. In this condition a jury-mast was erected, to which a foretop-staysail was bent. It was concluded to make the nearest port that could be reached, and on the morning of Tuesday, the 31st day of October, at 10 a. m., she spoke the steamer Alhambra, from New York, bound to Charleston, while in her course, which took the brig in tow and brought her to the port of Charleston, where they arrived the same day at 5 p. m., and the brig was made fast to the wharf. The brig was twenty-two miles from the bar when met by the Alhambra. The facts which occurred when the Alhambra took the Ring in tow were these: The Ring signalled the Alhambra, and the Alhambra ran down to her. The captain of the Ring asked the captain of the Alhambra where she was bound for. Answered, for Charleston. The captain of the Ring then asked for a tow to Charleston. Captain Benson, of the Alhambra, then consulted Captain Edward S. Davenport, the pilot then in command of the Alhambra, whether it would be advisable to do so, if he could get the Alhambra in time to the bar. To which he answered he could. A hawser was then passed from the Alhambra to the Ring, and a hawser also from the Ring to the Alhambra. The hawsers were passed by a line from one vessel to the other. No boat was lowered, and none of the crew of the Alhambra went aboard the brig. The Alhambra was not delayed at all. The weather was fine, a little swell in the morning, but calm and growing calmer in the evening. It was proved by very reliable witnesses that the Alhambra, the salving ship (a steamer), was worth from one hundred and forty to one hundred and fifty thousand dollars, and her cargo from two hundred and fifty to three hundred and fifty thousand dollars, and, by the testimony of highly accomplished engineers, one of them of the greatest authority, that her engine of 340 horse-power was worth from twenty to thirty thousand dollars ($20,000 to $30,000). It was also in evidence that steamers cost three times as much to run them as sailing vessels. It will have been seen, also, from the condition of the Ring, that, though not in actual peril, she was in an exposed position, and from her helplessness in case of a gale from the east, would have been subjected to all the dangers of a lee shore.

The foregoing brief statement of facts presents all the elements which enter into the solution of the question as to the respective merits and claims of the owners and the crew of the salving ship, the steamer Alhambra. It is an elementary, rudimental legal truth, that the crew are, in strictness, the only salvors, and that "the maritime law empowers a master to employ, in a salvage service, a vessel under his command, and to put at hazard the interests of her owner; and it is for this reason only that upon considerations of general policy the owner is indemnified for the risk to which his property is exposed, by being as it were novated as co-salvor. The owner's claim to participate in the salvage reward rests always upon the risk and damage to which his property is or may be exposed, and on no other ground." See Mason v. The Blaireau, 2 Cranch [6 U. S.] 240; McDonough v. Dannery, 3 Dall. [3 U. S.] 188; Bond v. The Cora [Case No. 1,621]. To the same effect writes Conkling in his work on Admiralty Jurisdiction, title, "Salvage" (the most recent American authority): "When, as is generally the case, salvage is effected by one or more vessels, the owners, though they cannot properly be denominated salvors, are entitled to a share of the salvage on account of the exposure of their property to danger and loss. Stoppage on the ocean to save the property of another is a deviation from the voyage which discharges the underwriters— The Henry Ewbank [Id. 6,376]; Bond v. The Cora [supra]—and for this risk incurred the owner is entitled to be indemnified." "But the law (says Judge Story) does not stop short with a mere allowance to the owner of an adequate indemnity for the risk taken. It has a more enlarged policy and a higher aim. It looks to the common safety and interest of the whole commercial world in cases of this nature, and it bestows upon the owner a liberal bounty and reward to stimulate him to a just zeal in the common cause, and not to clog his voyages with narrow instructions, which should interdict his master from any salvage service. The law has a nice regard to considerations of this nature, and it offers not a premium of indemnity only, but an ample reward measured by an enlightened liberality and forecast." The Henry Ewbank [supra]. This view of the subject is in accordance with that taken by Chief Justice Marshall in delivering the opinion of the supreme court in a case where he observes that the same policy which awards a liberal remuneration to captains and crews ought to extend to all owners the same reward for a service which deserves to be encouraged; and it is surely no reward to a man made his own insurer without his consent, to return him little more than the premium he advanced. Mason v. The Blaireau, 2 Cranch [6 U. S.] 240. Mr. Justice Story also suggests that the extension to owners of the same principles of remuneration that are applied to officers and seamen is further recom-

mended by the strong inducement it furnishes to the latter "not to desert his own proper duty to their owner and his interests for selfish purposes, by making them share only in subordination to and in connection with those interests." In the case of Mason v. The Blaireau, the supreme court adjudged to the owners of the salvor ship one-third of the amount of the salvage allowed.

In the case above cited, decided by Mr. Justice Washington, after grave consideration, he awarded to the owner the same proportion, and it was adopted by Mr. Justice Story in the case before him, not only as suitable to the circumstances of the particular case, but as in his opinion constituting the true general rule of remuneration, not as a rule absolutely inflexible and not to yield to any extraordinary merits or perils or losses on the part of owners, for cases may exist in which one-half might with propriety be allowed to the owner, as has sometimes been done. From the authorities carrying with them the weight to be attached to the opinions of the most eminent judges of the supreme court which the country has produced, it will have been seen that the seaman, as has been remarked, is in strictness the only salvor, and that the owner is only associated with him, and the privileges of a salvor conceded and extended to him from considerations of equity and policy; and that as between the salving ship or owner and the crew, unless in very extraordinary cases, the rule has been, and is, to give one-third of the salvage to the owner, and two-thirds to the crew. The mariner has the preference and naturally and reasonably. He is the indispensable human agent by whom in cases of actual danger the salvage is, with displays of courage, hardship, suffering, enterprise, and skilful effort, effected; and in cases where the displays are not called for, as in the case at present under consideration, he is the indispensable actor by whom the salving ship is governed and the work accomplished. Not only so: the law favors him because of his very calling itself, which is one of habitual peril, exposure, and hardship. He is the rational, responsible guardian of all the immense property committed to the chances of the ocean. His presence simply on the ocean in all times of need is at the cost of a life of unequalled dangers and hardships, and at best but poorly requited toil. Like a soldier in an enemy's country, danger is his constant companion. He cannot sleep, but with his weapon in his hand, to be ready at any moment for a mortal assault. Not merely, then, for the efforts he may put forth on any particular occasion, but that he is the only one of the family of man at unceasing and painful cost ever present to extend aid in time of danger to person and property, does the law consider him with peculiar favor and repay him with grateful and generous rewards.

If this, then, were a case in which the salvage was performed by a sailing vessel under the precise circumstances, the law would not warrant more than the award of one-third of the salvage to the owner. But the introduction of steam and the employment of large steamers under the practice in England, whilst it has not modified the principles, has varied the proportion of the salvage distributable between the owner and the master and crew. From the greater costliness and efficiency of these instruments of salvage the law looks upon them with favor and recognizes in the owner a benefactor who deserves to be speedily rewarded for an outlay of capital so largely promotive of the interests of commerce and humanity. This practice of the court of admiralty in England has found sanction and recognition in one case in our country, and that occurred in our own waters in the case of Brooks v. The William Penn [Case No. 1,965]. This case recognized the practice of the courts of England as of obligation in the United States, and since that this practice has the force of authoritative precedent, and addresses itself to us with the combined authority of law and policy and enlightened equity. When duly considered, this practice is only in substance a considerate application of the principles of the general law of salvage, as attempted to be developed in what has heretofore been said. The owner in these mighty machines, so costly, has, whilst he has put so much more at stake, furnished to the ocean instruments proportionately more effective in giving speedy, certain, and prompt aid and rescue to imperilled life and property. His reward should be proportionate to the greater risk, and find also some increase in the greater service. The prominent cases in which this practice is illustrated and these principles enforced are The Raikes, 1 Hagg. Adm. 246; The Earl Grey, 3 Hagg. Adm. 363; and The Beulah, 1 W. Rob. Adm. 477. The first of these cases only furnishes the authority for the greater compensation of steamers than sailing vessels. It does not deal with the comparative remuneration of the ship and the crew. The several portions of each is not stated in the judgment of the court. Lord Stowell remarks: "This is a case of salvage service performed by the Monarch, steam packet; and it is the first case in which compensation has been claimed in this court for the services of a vessel of this peculiar character. I am therefore inclined to give as much encouragement as possible to similar exertions on account of the great skill and great power of vessels of this description." There is no analogy in the two cases; it stops with the instrument. The steamer was sent for to Dover and was empty. The ship saved was an East Indiaman of much value; cargo worth about sixty thousand pounds. "She was in the Downs—in a situation of actual apprehension, though not of actual danger; she had

solicited the attention of a Deal boat—a class of boats, as is well known, very active and eminently useful in conducting vessels into Ramsgate harbor. She had removed the vessel from the sand upon which she had struck; but still there was apprehension of danger, and provision was therefore required for the future safety of the vessel. It was recommended that a steam vessel from Dover should be sent for; it therefore cannot be denied that the agency of a steamboat was highly useful and desirable. The boat has also merit from the alacrity with which she quits the harbor; she goes out, it would seem, at some risk, it being an hour after high water; upon reaching the vessel, lies by her all night—a night in the month of December—watching and attending her, and ready to perform any service that may be required the next day, when she transports her into Ramsgate harbor. The vessel was of great wealth; she resorted to the assistance of a steamboat, after having resorted to one of lower species; so that on the whole, I think, I should have given more than the commissioners. One hundred and fifteen pounds does not seem to me an adequate reward; and I shall propose a moderate addition, by making the retribution two hundred pounds, and the expenses of this appeal." It will be observed that this case throws no light whatever on the relative value and remuneration of the ship and the crew. It is not certain that any was made. It is only sufficient to show the estimate in which such services were held and rewarded and that a steamer should be more handsomely compensated. The case of The Beulah, when carefully read and its true meaning elicited, does not seem to furnish any help in solving the question proposed for our solution. The statement of the case is very brief, and cannot well be abbreviated with advantage. It is thus stated: "In this case the court was moved to decree an apportionment of a salvage award amongst the owners, master, and crew of the steam-tug Copeland for services rendered to the vessel—the Beulah. It appeared that the sum of £500 had been awarded by the court for the service in question, and this sum had been apportioned by the Ship's Owners' Company, to which the steam-tug belonged, according to a scale of distribution laid down and adopted by the company in such cases. By this scale the company (as the owners of the Copeland) took to themselves £415; the master received £41 13s. 6d., the engineer £2 per cent. poundage besides his distributive share, and the stokers and common seamen £4 15s. 3d. per man. An act on petition was given in on behalf of four of the seamen, praying the court to make a more suitable allotment. "The court decreed the following apportionment: To the owners £415 0s. 5d.; to the master £28 6s. 8d.; to the first mate £10 2s. 4d.; to the engineer £10 2s. 4d.; to the second mate £8 1s. 10d.: to three seamen £8 1s. 10d.; to one apprentice-boy £4 0s. 11d." The

amount awarded to the owners of the tug, in this case, it appears, was nearly four-fifths. But it cannot escape observation that the captain and crew were rewarded for their service by a scale of distribution laid down and adopted by the company in such cases. So far as appears from the report of the case, it would seem that the captain and crew received as a body, and were paid what they agreed to receive when they took service in the "Shipowners' Company." No point seems to have been made as against the share of the owners. Their share remains undisturbed by the court. The only change in the distribution was among the employés of the company. All that can be safely deduced from the case as reported, is that, as between the owners and the captain and crew the scale of distribution of the salvage upon which they did business, and with reference to which they engaged the services of their employés, was maintained by the court. It was a special contract, and governed by its own terms. No general rule can be deduced from it; and, as previously remarked, it furnishes no precedent or help in the solution of the question before us. We now come to the case—that of The Earl Grey, 3 Hagg. Adm. 363—which is largely analogous to the one before us, and which, while it maintains the distinction taken in favor of "large steamers," furnishes a valuable precedent as to the proportion of the salvage to be awarded to the owners and the master and crew. The statement of the case is as follows: "The Earl Grey, a vessel of 470 tons, on a voyage from Liverpool to Africa, having been run foul of in St. George's channel, and her bowsprit and foremast carried away, was met in this disabled state, with a signal of distress flying, on the 19th of August, by the Solway steamer (two engines each of forty-five horse-power), bound to Liverpool, and by her towed into that port. The towing occupied twenty-nine hours, and the value of the steamer was twelve thousand pounds, and that of the Earl Grey and her cargo about four thousand pounds. The facts were agreed upon. Sir J. Nicholl, observing upon the hopeless state of the vessel when the steamer came to her assistance, and the necessity of giving an ample reward to large steamers, decreed £900; and on a subsequent day, upon the application of the owners and mariners of the steamer, the learned judge apportioned that sum, giving £450 to the owners,—being half of the whole,—on account of the value of their property, which had been put in some risk." One-half the salvage was given, under the circumstances and with reference to the value of the two vessels, to the owners; a larger amount than appears to have been given in any case which possessed the elements and character of salvage, which has been brought to our attention or is known to us. Before making any remarks upon it I will briefly allude to the case of The William Penn, which has been heretofore noticed, and which has been ad-

duced as an illustration of the large reward given to the owners of steamboats or steamships, in comparison with sailing vessels. The judgment in that case, all would admit, is an eminently sound one. Nearly five-sevenths of the salvage was given to the owners of the steamer Jasper. But the circumstances were in sharp contrast, rather than in analogy to the case we are considering. The salving steamer was placed in the utmost peril. Her very existence was broadly staked in her adventure to save the Penn. Captain Hayden (one of the witnesses in the case) says he ran the Jasper until she was in seven feet of water, her draft being five and a half. It was a stormy-looking night, heavy sea, and dark overhead. He had been a mariner for thirty-three years. He considered the Jasper in great risk—more so than he would ever run again to save property. He was acquainted with the shoals. The Jasper's stern was in the breakers. The sea broke and washed through her after gangways, stove in one of the deadlights, and, though the pumps were going all the time to keep the water under, she had a foot and a half water in her when she reached town. As bearing upon the risk taken by the owner of the Jasper, and the peril she was in, another test is remarked upon by Mr. Justice Wayne in his presentment of the case. He says: "In this instance the presidents of two insurance companies in Charleston, accustomed to calculate marine risks, and well enough acquainted with the reef upon which the William Penn was run aground to form a safe judgment of her danger, and the hazard to be run by a steam packet in the attempt to get her off, declared that they would not have taken a risk at all for such adventure, if any part of the duty was to be done in a night in February, nor under any circumstances for less than a premium of twenty to twenty-five per cent. In such cases then (remarks the judge), the risk must always be run by the owner of the steamer, as it was in this by the owners of the Jasper." And it may be well here to observe that the danger was very unequally shared by the Jasper and her crew. She was in imminent danger, and they not. If in mid ocean, danger to the ship would be danger to the crew, but not so in a harbor, on the coast, or in the present case. The Jasper might have been broken to pieces on the shoal for want of water. The crew could have remained aboard of her safe until taken off, or at any time could have retreated in safety in their boats. The wrecks that strew the beach of Sullivan's and Long Island are proof to show that vessels may be destroyed and no lives lost.

After this careful review of the authorities, we are brought to the conclusion that the case we have to decide is different in many of its elements from any which appear in the books; and the one which is nearest it, and which can alone afford some approximation to a rule and a proper solution, is that of The Earl Grey. It is to be noted that in The Earl Grey the salving ship was at "some risk," the vessel saved was in a "hopeless state" when the Solway steamer came to her rescue, that she was three times the value of the ship saved, that the towage took her twenty-nine hours, and she came within the category of "large steamers," to whom there is "necessity" of giving an "ample reward;" and the share of the salvage in point of fact given to the owner of said ship under such circumstances was "one-half." The case of The Alhambra, though like, was different in many of its elements. It cannot be said that the C. W. Ring was in a "hopeless state" when she signalled to the Alhambra. She was not in any immediate danger, and it is reasonable to suppose that she might have got into harbor without any help, or received timely help from some other quarter. But she certainly was in an exposed position, and might have been brought to imminent danger in a few hours, and before she could have received help. The fact that the gallant and devoted officers and crew who had so nobly done their duty to her and her owners, in the gale which they had with such peril and hardship survived, thought it prudent to seek the aid of the Alhambra, is in itself the best evidence of the dangerous position of their brig, and the best measure of the merit of the services of the Alhambra. The Alhambra, a steamer, and "a large steamer," gave immediate aid, and from her characteristics as a steamer, and a very powerful steamer, made her rescue of the Ring prompt and certain, and in a few hours placed her and her valuable cargo in perfect safety alongside of our wharves. Unlike a sailing vessel, the Alhambra was not subject to calms or head winds, or dangers of a lee shore. It cannot be said that the service of the Alhambra was accompanied by any sensible danger, or that there was any appreciable risk to her and her cargo. The witnesses agree in the statement that "the weather was fine; a little swell in the morning, but calm and becoming calmer and smooth in the evening." The only apprehension of danger, or of delay, was from not arriving at proper time for crossing the bar. But it is in evidence when the captain of the Ring asked for "a line to Charleston," the captain of the Alhambra (very prudently) consulted the pilot as to "whether it would be advisable to do so, if the pilot could get the Alhambra in time to the bar." He was answered, "I could." Yet, though there was not any appreciable danger or risk, discoverable or encountered in point of fact, by the Alhambra, and no delay or deviation from her voyage, which would have forfeited the policy of insurance of the Alhambra and her cargo, yet it cannot be questioned if any accident in the infinite chapter of accidents had happened to the Alhambra, by reason

of the brig attached to her; if in crossing the bar this appendage, by reason of any perverse current or eddy, or obstruction, had disturbed the steerage of the Alhambra, and brought her into troubles, that her policy of insurance would have been forfeited, and that any loss that would have occurred, would have been thrown upon the owners. In this connection, it is proper to bring to view the facts that the steamer was worth from one hundred and forty to one hundred and fifty thousand dollars, and her cargo estimated at two hundred and fifty thousand to three hundred and fifty thousand dollars, and the expense of running such a vessel three times as much as a sailing vessel of the same tonnage. The engines of the Alhambra were worth from twenty-five to thirty thousand dollars, and were of three hundred and forty horse-power. The peculiar claim to consideration in the apportionment of salvage, on the part of the owners, is based on the fact that the salving vessel was a steamer, and a "large steamer," and that there was risk to the large property invested in her and her cargo, which the owners were responsible for. The vessel was a much more costly instrument than the Solway steamer, and the risk, though very slight, was something to the vessel and cargo. On these grounds, instead of one-half, the undersigned feels warranted, and thinks it just that the owners should receive three-fifths of the salvage, and the master, officers, and crew two-fifths thereof, and he so awards. And in assigning the two-fifths to the officers and crew, though they did not put forth any peculiar effort, and were subject to no peculiar hardship in this particular case, they nevertheless, as in the instance of the officers and crew of the Solway steamer, did all that was necessary, and their whole duty. The responsibility was on the captain and pilot to wisely govern this noble ship, and on the engineers, firemen, and sailors to skilfully work her grand machinery. They were the true salvors, and this great ship was committed to them by the law and the well-founded policy of all nations, as the instrument to accomplish their beneficent work. They were both necessary and indispensable to the result. If the reward for the special service is large and liberal, it should be remembered that it was achieved on the theatre of which the mariner alone knows the terrible perils, the unequalled hardships, and the constant anxieties. He had reached the spot to do this very service through a gale which had rendered helpless his brother sailors, and nearly wrecked their vessel and drowned them. Every owner of the property committed to sea, every shipowner especially, is interested in the last degree in seeing to it that the law of salvage be maintained in its strictness, and that the mariner should have the most liberal reward for his services; and if he comes to luck, should be glad of it; and if there be any perquisites in his hard life, should rejoice at it, and see that he gets them. And if this case, both as to the owners and the master and the crew, should partake of this character, it will not be matter of regret either as to the owner, who, at such cost, has put such a noble ship on the ocean, subject to the thousand risks of the sea, or as to the master, pilot, and crew, who, living a life of hardship, have, as in this case, in perfect fidelity and prudence, done their whole duty to their owners and all the interests committed to their care.

[In a special award, the referee will make the allotments of the master, officers, and crew of the Alhambra. He cannot sign this paper without making the acknowledgment that the eminent counsel engaged in this cause, Pringle & Porter for the owners, and Mr. Magrath for the officers and crew, in their ample and learned citation of authorities, and their acute and able expositions of the law and its philosophy, have left him nothing to attempt but to weigh their suggestions and hold the scales between them. He has given to all their citations of the law the most careful consideration, and endeavored to profit by their argument, urged with marked zeal, ability and eloquence. In a case of novel impression without precedent, he has endeavored to hit the truth and do exact justice—so hard to do under such circumstances, and when done so difficult to commend to the judgment of all. His best, anxious, earnest endeavor to attain this result is in the award he has made.][1]